UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CORNELIUS FRIESON,

    Plaintiff,

  v.

DELTA AIRLINES, INC.,

    Defendant.

CIVIL ACTION NO.
1:12-CV-3885-JPB

## ORDER

This matter comes before the Court on Delta Airlines, Inc.'s ("Defendant")

Motion for Dismissal Sanctions [Doc. 55].  This Court finds as follows:

## BACKGROUND

Cornelius Frieson ("Plaintiff") filed this action on November 13, 2012,

alleging that Defendant suspended and subsequently terminated him in violation of

the Americans with Disabilities Act ("ADA").  [Doc. 3, pp. 2–3].

Given the age of this matter, the Court will begin with a review of the

procedural history.  The case was stayed on May 6, 2013, because Plaintiff was

unable to sit for a deposition due to his medical condition.  [Doc. 32].  On March

21, 2014, the Court administratively closed the case for the duration of the stay.

[Doc. 36].  Plaintiff moved to reopen the case on January 14, 2020, and the case

was reopened on August 18, 2020.[1]  [Docs. 38, 45].  Plaintiff was deposed on March 3, 2021.  [Doc. 54].  Defendant filed the instant Motion on March 31, 2021.  [Doc. 55].  Defendant alleges that Plaintiff committed numerous instances of perjury during his deposition and seeks dismissal of the case as a sanction, as well as attorney's fees for preparing the Motion.  [Doc. 55-1, p. 2].

On March 31, 2021, Plaintiff filed an Extraordinary Motion to Complete Deposition of Rebuttal Expert Witness and Extension of Time to Respond to Motion for Sanctions.  [Doc. 56].  Plaintiff filed an Amended Extraordinary Motion on April 3, 2021.  [Doc. 57].  Therein, Plaintiff requested an extension of time to respond to Defendant's Motion for Sanctions and the opportunity to depose Dr. Winston Gandy, Plaintiff's physician, who Plaintiff claimed could rebut the perjury allegations.  Id. at 3, 4.  On January 6, 2022, the Court granted in part Plaintiff's Amended Extraordinary Motion, reopening discovery for a brief period for the limited purpose of obtaining Dr. Gandy's testimony and permitting the parties to file supplemental briefing as needed.  [Doc. 65, pp. 3–4].  Dr. Gandy was deposed on January 20, 2022.  [Doc. 70].

---

[1] Discovery was reopened and set to close on December 15, 2020.  [Doc. 45].  Following a joint motion, discovery was extended to close on March 15, 2021.  See December 10, 2021 Docket Entry.

The Court will now turn to the facts of the case.  Plaintiff worked for Defendant as a Ground Service Equipment Technician from 2005 until his termination in 2010.  [Doc. 55-1, p. 3].  Plaintiff reported to a lead mechanic, who in turn reported to a General Manager, Mike Maier.  Id.  Plaintiff was absent from work on March 9, 2010, and March 11, 2010, and did not notify his supervisors in advance of his absences.  Id. at 4; see also [Doc. 54-10].  He was late to work on March 10, 2010, again without notifying his supervisors.  [Doc. 55-1, p. 4]; see also [Doc. 54-10].  Because Plaintiff was on "Final Warning" at that time and had "continued issues with his reliability and job performance," Maier suspended Plaintiff and recommended him for termination on March 12, 2010.  [Doc. 55-1, p. 4]; see also [Doc. 54-10].  Human Resources approved Plaintiff's termination on March 23, 2010, and Plaintiff was informed of his termination on April 5, 2010. [Doc. 55-1, p. 4]; see also [Doc. 54-11].  The circumstances leading to and surrounding Plaintiff's termination prompted his lawsuit and are now at the center of this matter.

In the instant Motion, Defendant alleges that Plaintiff committed perjury related to the following topics covered during Plaintiff's March 3, 2021 deposition: (1) 2006 and 2008 Final Warning Letters; (2) August 2009 Letter; (3) October 2009 Return to Work; (4) Events of March 9, 2010; (5) Events of March 10, 2010;

(6) Events of March 11, 2010; and (7) 2010 Leave Application.  The Court will summarize Defendant's allegations below.

1.    *2006 and 2008 Final Warning Letters*

Maier sent Plaintiff a "Final Warning Letter" on August 31, 2006, related to problems with Plaintiff's job performance.  [Doc. 54-4].  On January 3, 2008, Maier sent Plaintiff a second letter, with the subject "Final Warning Letter (Reiterated)," describing Plaintiff's involvement in a vehicular accident on December 20, 2007, and referencing Plaintiff's previous Final Warning Letter. [Doc. 54-6].  Plaintiff's signature is visible on both letters on a signature line indicating that he "read and fully underst[ood] the contents of th[e] letter[s]." [Doc. 54-4, p. 2]; [Doc. 54-6, p. 1].

Defendant alleges that Plaintiff committed perjury by testifying during his deposition that he never received these letters and had never seen them before. [Doc. 54, pp. 22, 31, 35, 36].  Plaintiff testified that the signature on the letters was his but that someone must have copied his signature.  Id. at 22, 35, 36.  Plaintiff also testified that he was not at work in December 2007, when the accident took

place that prompted the January 2008 letter;[2] Defendant contends that this testimony, too, was perjury.  Id. at 27, 30.

Plaintiff admitted receiving at least the 2008 Final Warning Letter in his initial disclosures to this Court.  See [Doc. 20, p. 2] (referencing "[t]he letter . . . [Maier] gave the plaintiff [in] January 2008" and describing it as "plac[ing] the plaintiff on a final warning letter, the last and most severe step in [Defendant's] administrative action policy").  Plaintiff also confirmed receiving the 2008 Final Warning Letter in an email he wrote to Defendant's Human Resources department on January 28, 2008.  [Doc. 55-2, p. 7] ("Later a final warning letter (that still is unresolved) was place[d] in my files.").  Plaintiff also previously confirmed his involvement in the December 20, 2007 accident.  He provided Defendant with a handwritten statement describing the accident, id. at 26, and completed and signed a form dated December 20, 2007, authorizing the release of the results of any drug and alcohol tests, id. at 30.

---

[2] Plaintiff made the same representation—that he was not at work in December 2007—in his initial disclosures to this Court, [Doc. 20, p. 2] ("The plaintiff was off from work . . . from March of 2007 to September 2008."), and in an affidavit submitted to this Court, [Doc. 60-2, p. 2] ("I was not physically at work . . . from February 2007 through September 2008.").

2.    *August 2009 Letter*

On August 21, 2009, Maier sent Plaintiff a letter regarding Plaintiff's absence from work.  [Doc. 54-7].  According to the letter, Plaintiff informed Defendant on August 11, 2009, that he would be unable to work while he recovered from surgery.  Id.  Defendant did not hear from Plaintiff and contacted him again on August 19, 2010.  Id.  Plaintiff then advised that he would return to work on August 20, 2009.  Id.  He did not return to work on August 20 or on August 21 and did not inform management in advance of those absences.  Id.  Maier informed Plaintiff in the letter that he would recommend Plaintiff's termination if he did not hear from Plaintiff by August 28, 2009.  Id.

During his deposition, Plaintiff testified that he had never seen the August 2009 letter.  [Doc. 54, p. 40].  He also testified that he did not speak with anyone in August 2009 and that he was suspended from work during that time period.  Id. at 41.  Defendant argues that this testimony constituted perjury.

In his initial disclosures to this Court, Plaintiff admitted receiving a "job abandonment letter" at his home following a "medical incident" in August 2009.  [Doc. 20, p. 2].  In a handwritten letter dated August 25, 2009, Plaintiff described contacting Defendant on August 11, 2009, about his surgery; informing management on August 19, 2010, that he expected to return on August 20; and

explaining that he "thought [he] was doing everything by company policies."

[Doc. 55-2, p. 32].

3.      *October 2009 Return to Work*

After Plaintiff's absence in August 2009, Plaintiff returned to work on

October 6, 2009.  [Doc. 54, p. 87].  On that day, Maier sent Plaintiff a "Policy

Clarification Memo" reviewing Defendant's policies regarding leave from work.

[Doc. 54-8].  Plaintiff's signature is at the bottom of the memo.  See id.; [Doc. 54,

p. 42].  Plaintiff denied receiving the Policy Clarification Memo in a February 10,

2011 response to an inquiry from the Equal Opportunity Employment Commission

("EEOC").  See [Doc. 55-2, p. 40].  Plaintiff later confirmed receiving the memo,

though, in his initial disclosures to this Court, which were filed on January 22,

2013.  [Doc. 20, p. 2].

Aside from conflicting information about whether Plaintiff received the

Policy Clarification Memo, Defendant contends that during his deposition, Plaintiff

falsely testified about his return to work in October 2009.  When he was deposed,

Plaintiff testified that he was supposed to be placed on "light duty" when he

returned to work that month.  [Doc. 54, p. 87].  He further testified that Dr. Gandy,

his physician, provided him with a letter instructing him to avoid heavy lifting

upon his return because of his medical condition.  Id.; see also id. at 97.  During

the deposition, Defendant's counsel presented Plaintiff with a light duty letter that appears to be from Dr. Gandy; however, that letter was dated March 23, 2010 ("2010 letter").  See id. at 96–97; [Doc. 54-12, p. 2].  Plaintiff testified that the March 2010 letter was not the first letter that Dr. Gandy sent to Defendant recommending that Plaintiff be placed on light duty; instead, according to Plaintiff, Dr. Gandy first provided such a letter "back [on] October 6th of 2009."  [Doc. 54, pp. 96–97].  Plaintiff reaffirmed the existence of this 2009 letter in an affidavit submitted to this Court.  [Doc. 60-2, p. 5].  In that same affidavit, Plaintiff said that when he returned to work in October 2009, he was "forced to work with no modifications," despite the alleged light duty letter from Dr. Gandy.  Id. at 6.

Defendant contends that Dr. Gandy "never set any lifting or light duty instructions for [Plaintiff] in 2009."  [Doc. 55-1, p. 10].  According to Defendant, the documents initially disclosed by Plaintiff's counsel did not include a 2009 light duty letter.  Id.  Plaintiff did, however, provide the purported letter ("2009 letter") as an exhibit accompanying an affidavit he submitted to this Court as part of his Response to Defendant's Motion.  See [Doc. 60-2, p. 32].  That letter appears to be from Dr. Gandy, and the letter notes that "heavy lifting would not be advisable at this time."  Id.  "Sept 2009" is handwritten on the top left corner of the letter, and

above the subject line, Plaintiff wrote his Delta employee number and signed his initials.  Id.

In its Reply, Defendant argues that in addition to committing perjury about his return to work on October 6, 2009, Plaintiff tampered with evidence by materially altering the March 2010 letter to appear as if it were a letter from 2009. [Doc. 61, pp. 2–4].  The letter Plaintiff alleged was from 2009 is nearly identical to the 2010 letter that Defendant's counsel produced during the deposition.  The header, subject line, text and signature of both letters are the same.  *Compare* [Doc. 54-12, p. 2] (2010 letter) *with* [Doc. 60-2, p. 32] (2009 letter).  The 2010 letter shows a date of "March 23, 2010" above the subject line.  [Doc. 54-12, p. 2].  On the 2009 letter, though, Plaintiff marked over the date to write his Delta employee number and initials.[3]  [Doc. 60-2, p. 32].  In the affidavit accompanying the 2009 letter, Plaintiff explained that he wrote the date on the document "to show the month and year that [he] provided this letter to [Defendant]" and, similarly, that he wrote his Delta employee number and initials to show that he gave the 2009 letter to his supervisors.  Id. at 5.  Plaintiff did not otherwise address the similarity between the 2009 letter and the 2010 letter.  Defendant argues that Plaintiff's

---

[3] The 2009 letter also appears to have been scanned along with two images of Dr. Gandy's business cards; those are not present on the March 2010 letter.  *Compare* [Doc. 54-12, p. 2] *with* [Doc. 60-2, p. 32].

"writing his employee number on the [2009] letter does not show that he had given the letter to anyone" and that Plaintiff wrote his employee number on the 2009 letter "solely for this lawsuit to hide the actual March 23, 2010 date of the letter." [Doc. 61, p. 4].

During Dr. Gandy's deposition, he testified that he did not prepare either the 2009 letter or the 2010 letter.  [Doc. 70-1, pp. 13, 15].  He explained that he hand signs all letters of this nature; that the 2010 letter appeared to bear an electronic signature; and that the name under the signature ("Winston H. Gandy, M.D.") was not how he presents himself (rather, "Winston H. Gandy Junior, M.D.").  Id. at 13–14; see also id. at 21.  Dr. Gandy further stated that he would not have written the letter, which states that Plaintiff underwent "a surgical procedure on his heart," [Doc. 70-5, p. 2], because Plaintiff was in fact being treated for an operation "on his descending aorta and the aneurysm"—not on his heart, [Doc. 70-1, p. 13]. Additionally, both letters suggested that Plaintiff "be considered for re-training for a different service as he is a valued employee."  [Doc. 70-4, p. 2] (2009 letter); [Doc. 70-5, p. 2] (2010 letter).  Dr. Gandy testified that he "certainly wouldn't

have written a note telling somebody to retrain [Plaintiff] for another job" and that

he "[had] never written anything like that."[4]  [Doc. 70-1, p. 15].

    4.    *Events of March 9, 2010*

       On June 27, 2010, Plaintiff's mother sent a letter to Defendant on Plaintiff's

behalf regarding Plaintiff's termination.[5]  [Doc. 54-17, p. 1].  Plaintiff's mother

provided an appointment card showing that Plaintiff had an appointment scheduled

for March 9, 2010, at Piedmont Heart Institute.  Id. at 2.  She also included a letter

ostensibly from Dr. Gandy, who was employed at that time by Piedmont Heart

Institute, in which he explained that Plaintiff came to his office on March 9, 2010,

but that his appointment had to be rescheduled for April 9, 2010, because Dr.

Gandy was not available to see patients on March 9.  Id. at 3.

---

[4] Dr. Gandy testified that around November and December 2019 and December 2021, he discovered that employees in his office "were using [his] signature and the practice to sell work excuses" and to "falsify income and job stuff."  [Doc. 70-1, p. 28]; see also id. at 29.  He stated that he did not believe this issue was "extensive" and that all employees who were involved were subsequently terminated.  Id.  However, all of the employees involved in this scheme worked at Dr. Gandy's practice in 2009 and 2010, when Plaintiff presumably obtained the letters at issue.  Id. at 30.  Dr. Gandy also testified that all of these employees had interactions with Plaintiff.  Id.  As to the 2010 letter, Dr. Gandy stated that he "[didn't] doubt that [Plaintiff] could have got[ten] it from someone in the office," id. at 36, but did not believe that one of his nurses wrote the main text of the letter, id. at 37.

[5] Plaintiff's mother indicated in the letter that Plaintiff was in the hospital's ICU, which is presumably why she was communicating on his behalf.  [Doc. 54-17, p. 1]; see also [Doc. 55-1, p. 11].

Plaintiff testified during his deposition that he had never seen the letter sent by his mother, that the signature on the letter was not his mother's signature and that the letter from Dr. Gandy was fabricated.  [Doc. 54, pp. 47–49, 53].  Plaintiff also testified that he did not have an appointment with Dr. Gandy on March 9 but that instead his appointment was with Dr. Arthur Lee ("Dr. Lee").  Id. at 55, 60–61.  Defendant argues that all of this testimony was false.

Plaintiff testified that he did not report to work on March 9, 2010, and did not call in that day to report his absence.  Id. at 59, 70–71.  He explained, however, that in January 2010, he told his direct supervisor, Tommy Lee ("Lee"), that he had appointments in March and would need to take leave those days.[6]  Id. at 59; see also [Doc. 54-14, p. 1].  However, Plaintiff did not name Dr. Lee in an interrogatory response identifying his treating physicians, [Doc. 55-2, p. 54], and according to Defendant, there is no reference to a "Dr. Lee" in Plaintiff's medical records, [Doc. 55-1, p. 13].  Further, the appointment card provided by Plaintiff's mother was for a March 9 appointment at Dr. Gandy's practice, which did not employ Dr. Lee.  Id.

_____

[6] A March 12, 2010 memo from Maier notes that "[n]o notifications were received by Lead Tommy Lee or anyone else prior to . . . the March absences" and that Lee "had no prior recollection" of Plaintiff's alleged January request to take leave for appointments in March.  [Doc. 54-9].

Plaintiff's mother provided an affidavit in which she said that she did not write the letter that was attributed to her.  [Doc. 60-3, p. 2].  Defendant argues that her affidavit is immaterial:  according to Defendant, Dr. Gandy's letter shows that Plaintiff had a March 9 appointment with Dr. Gandy that was postponed, contradicting Plaintiff's deposition testimony that he had no such appointment. [Doc. 61, p. 7].  Plaintiff has not since produced any record of a March 9, 2010 appointment with Dr. Lee or any other physician.  [Doc. 55-1, p. 13].

Dr. Gandy testified that he was in the office on March 9, 2010, and that he did not recall treating Plaintiff that day.  [Doc. 70-1, p. 16].  Dr. Gandy stated that he did not have scheduled vacation on March 9, 2010, and had "no recollection of missing any days at work while [he] was at Piedmont for any reason other than a scheduled vacation."  Id. at 32.  Dr. Gandy testified that it was not possible that Plaintiff came to his office on March 9 but was turned away with a new appointment time because he "never refuse[s] to see a patient that shows up . . . [e]ven if it's the wrong day or wrong week."  Id. at 34.  According to Dr. Gandy, the letter explaining Plaintiff's rescheduled appointment was not a document he prepared or authorized.  Id. at 17.  Dr. Gandy had no recollection of being unable to see Plaintiff on March 9 or of his office's rescheduling Plaintiff's appointment for a later date.  Id. at 34.

13

5.   *Events of March 10, 2010*

Plaintiff's late arrival to work on March 10, 2010, was cited in the letter recommending Plaintiff's termination in the context of "continued issues with his reliability and job performance."  [Doc. 54-10].  Records of Plaintiff's access to his workplace using his employee ID card show that he arrived at 5:43 AM on March 10, 2010, for a 5:00 AM shift.[7]  [Doc. 55-2, p. 58].  In a March 26, 2010 email from Plaintiff's personal email address to a Human Resources representative for Defendant, Plaintiff said that he was not late on March 10; rather, he informed his supervisor beforehand that he would "need to make some changes on the time coming in" because he needed to take his cousin to the train station.  [Doc. 54-14, p. 1].  Plaintiff made the same point—he was not late on March 10 because he discussed changing his arrival time with his supervisor so that he could help his cousin—in a handwritten statement provided to Defendant.  See [Doc. 55-2, p. 64].

In a March 12, 2010 memo, Maier wrote that Plaintiff explained his late arrival on March 10 as "due to having to take a family member to the bus stop."

---

[7] Defendant alleges that Plaintiff arrived at 5:52 AM.  [Doc. 55-1, p. 14].  Defendant appears to be erroneously referencing Plaintiff's time of arrival on February 10, 2010, not March 10, 2010.  See [Doc. 55-2, pp. 57–58] (showing an arrival time of 5:52 AM on February 10, 2010, and 5:43 AM on March 10, 2010).  This discrepancy is immaterial because, as the record shows, Plaintiff was nonetheless late to his 5:00 AM shift on March 10.

[Doc. 54-9].  Maier noted in the memo that Lee confirmed "receiv[ing] explanation [of this situation] on a prior occasion but did not expect that it was an ongoing issue."  Id.

Defendant contends that Plaintiff committed perjury during his deposition by providing false testimony about his arrival on March 10, 2010.  Plaintiff testified that he arrived on time to work on March 10 and that he never called in to say that he would be late.  [Doc. 54, pp. 64, 68].  Plaintiff testified that the email address from which the March 26, 2010 email was sent was his personal email address, but he denied sending the message.  Id. at 65–67.  Plaintiff also testified that at the time, he did not have a cousin living in Georgia.  Id. at 68; see also id. at 64.

6.   *Events of March 11, 2010*

Plaintiff was absent from work on March 11, 2010, and did not inform management of his absence in advance.  [Doc. 55-1, p. 11].  During his deposition, Plaintiff admitted that he was absent on March 11 and that he did not call management that day to inform them of his absence; however, he said that he informed Lee in January that he would be absent on March 11.  [Doc. 54-1, pp. 70–71].  Plaintiff further testified that he attended an appointment with Dr. Mark Rheudasil on March 11, 2010.  Id. at 69–70.  According to Defendant, Plaintiff's

deposition testimony was the first time "in over [ten] years" that Plaintiff has ever alleged having such an appointment.  [Doc. 55-1, p. 14].

Plaintiff did not name Dr. Rheudasil in an interrogatory response identifying his treating physicians.  [Doc. 55-2, p. 54].  According to Defendant, Plaintiff has never before, "[i]n his many statements to [Defendant], the EEOC, the Georgia Department of Labor, and this Court," identified a doctor who he saw on March 11, 2010.  [Doc. 55-1, p. 14].  Plaintiff said that he saw Dr. Rheudasil in August 2009 in an affidavit submitted to this Court along with Plaintiff's Response to the Motion.  [Doc. 60-2, p. 7].  Plaintiff provided accompanying documentation of procedures ordered by Dr. Rheudasil, but all of those documents show that the procedures were performed in August 2009; none shows an appointment or procedure in March 2010.  See [Doc. 60-2, pp. 34–44].  Plaintiff has not provided any documents showing that he had an appointment with Dr. Rheudasil on March 11.  [Doc. 55-1, p. 14]; [Doc. 61, p. 9].

7.   *2010 Leave Application*

Plaintiff's ADA claim is premised on the allegation that he was suspended *after* having filed his application for a medical leave of absence.  See [Doc. 3, p. 8]; [Doc. 20, p. 2].  Documents from Sedgwick, a contractor for Defendant that manages employees' leave requests, show that Plaintiff submitted his request for

medical leave on March 16, 2010.  [Doc. 60, p. 94].  On April 13, 2010, Sedgwick informed Plaintiff that his leave was approved for the period of March 16, 2010, to May 1, 2010; on April 29, 2010, Sedgwick informed Plaintiff that his leave was approved from March 16, 2010, through June 1, 2010, instead.  [Doc. 60, pp. 98–99].  However, on June 9, 2010, Sedgwick retroactively denied the approval because Plaintiff was not an active employee at the time of his application for medical leave—i.e., March 16, 2010.[8]  Id. at 101.

Defendant contends that Plaintiff committed perjury during his deposition about the timeline of his request for medical leave.  Plaintiff testified that he requested medical leave in February 2010, not March 2010.  [Doc. 54, pp. 91, 93].  Plaintiff testified that he was an active employee when his request for medical leave was processed.  Id. at 80.  He admitted that he was on suspension on March 16, 2010, but testified that he had already been approved for medical leave by that date because his doctor provided the necessary paperwork in February.  Id. at 79.  Plaintiff stated that he saw Dr. Gandy in February 2010, was approved by Sedgwick for medical leave later that month and had a letter showing the approval.[9]  Id. at 79, 80–81.  According to Defendant, Plaintiff has not provided

---

[8] As noted earlier, Plaintiff was suspended on March 12, 2010.

[9] During the deposition, Plaintiff testified that the approval letter was "in [his] file." [Doc. 54, p. 81].  Defendant's counsel responded that the letter "wasn't produced to

any records of a February visit with Dr. Gandy, "much less a leave request from him in February 2010." [Doc. 55-1, p. 17].  Neither has Plaintiff provided a February 2010 letter from Sedgwick approving a medical leave request.  Id. at 18.  Finally, Dr. Gandy testified that he did not recall helping Plaintiff with his application to Sedgwick for disability leave.  [Doc. 70-1, p. 17].

## ANALYSIS

### A.     Legal Standard

District courts have "broad discretion" to impose sanctions.  Flury v. Daimler Chrysler Corp., 427 F.3d 939, 944 (11th Cir. 2005).  That discretion stems from their "inherent power to police those appearing before them."  Purchasing Power, LLC v. Bluestem Brands, Inc., 851 F.3d 1218, 1223 (11th Cir. 2017).  A court's inherent power serves dual purposes of "vindicat[ing] judicial authority without resorting to contempt of court sanctions" and "mak[ing] the non-violating party whole."  Id. at 1225.  The exercise of this inherent power is not intended to

---

[Defendant]" and asked Plaintiff's counsel to send the letter.  Id.  Plaintiff's counsel agreed to provide it "ASAP."  Id.  Defendant contends that "[d]espite repeated written requests, [Plaintiff's] counsel has not produced the mythical February 2010 letter."  [Doc. 55-1, p. 18].  In its Reply, furthermore, Defendant noted that the only Sedgwick documents filed by Plaintiff show that his leave request was approved on March 16, 2010, not in February 2010, as Plaintiff testified.  [Doc. 61, p. 9].

be a "remedy for protracted litigation;" rather, "it is for rectifying disobedience."
Id.

Sanctions may include the dismissal of a lawsuit or an assessment of attorney's fees. Chambers v. NASCO, Inc., 501 U.S. 32, 45 (1991). Dismissing a lawsuit is "the most severe sanction available to a federal court." Flury, 427 F.3d at 944. As such, the sanction of dismissal is only appropriate if the court finds that the plaintiff acted willfully or in bad faith and that "that lesser sanctions are inadequate to correct such conduct." Betty K. Agencies, Ltd. v. M/V MONADA, 432 F.3d 1333, 1339 (11th Cir. 2005); see also, e.g., Flury, 427 F.3d at 944. Finally, prior to imposing sanctions, a court must afford due process to the sanctioned party. In re Mroz, 65 F.3d 1567, 1575 (11th Cir. 1995).

## B. Dismissal Sanction

The Court will now consider whether Plaintiff showed willful or bad faith conduct sufficient to merit the imposition of sanctions; if he did, whether a sanction less than dismissal is sufficient in this instance; and if dismissal is appropriate, whether Plaintiff was afforded adequate due process prior to the imposition of the dismissal sanction.

1.     *Willfulness and Bad Faith*

A court may exercise its inherent powers and dismiss an action as a sanction "when a plaintiff's recalcitrance is due to [willfulness], bad faith, or fault." Phipps v. Blakeney, 8 F.3d 788, 790 (11th Cir. 1993); see also In re Mroz, 65 F.3d at 1575 ("Invocation of a court's inherent power requires a finding of bad faith."). According to the Eleventh Circuit Court of Appeals, "willfulness generally connotes intentional action taken with at least callous indifference for the consequences." Sizzler Fam. Steak Houses v. W. Sizzlin Steak House, Inc., 793 F.2d 1529, 1535 (11th Cir. 1986).  Bad faith occurs "when the court finds that a fraud has been practiced upon it, or 'that the very temple of justice has been defiled.'" Allapattah Servs., Inc. v. Exxon Corp., 372 F. Supp. 2d 1344, 1373 (S.D. Fla. 2005) (quoting Chambers, 501 U.S. at 46).

As noted earlier, Defendant alleges that Plaintiff perjured himself numerous times during his deposition.  The Court declines to enumerate every perjurious statement uttered by Plaintiff, but the Court concludes that Plaintiff committed perjury during his deposition by providing false testimony in at least the following instances:

      i.       Testifying that he had never seen or received the 2008 Final Warning Letter when he admitted receiving it in his initial disclosures to this Court;

     ii.       Testifying that he was not present at work in December 2007 when multiple records confirm his presence at work that month;

    iii.       Testifying that he had never seen or received the August 2009 letter when he admitted receiving it in his initial disclosures to this Court;

     iv.       Testifying that he was not late to work on March 10, 2010, when records of Plaintiff's access to the workplace confirm his late arrival;

      v.       Testifying that he had an appointment with Dr. Rheudasil on March 11, 2010, when the only records of his visits with Dr. Rheudasil are from August 2009; and

     vi.       Testifying that he applied and was approved for medical leave in February 2010 when documents show that Plaintiff submitted his application on March 16, 2010.

The Court considers Plaintiff's false testimony to be both willful and in bad faith. Plaintiff took intentional action by testifying falsely about a number of

different facts during his deposition, then reiterating his false testimony in affidavits that he subsequently submitted to this Court.  Recurring perjury of this sort rises to the level of bad faith necessary for sanctionable conduct.

Other courts in this district have reached similar conclusions following like facts.  In one case, the court dismissed the action after finding that the plaintiff acted in bad faith when he lied about his financial status on his *in forma pauperis* affidavit and when he "continu[ed]" to provide false testimony as to his financial status at a deposition and evidentiary hearing.  Igbinadolor v. Gwinnett Cnty. Sch. Dist., No. 1:08-CV-2402, 2009 WL 10666374, at *10–11 (N.D. Ga. Aug. 31, 2009), R. & R. adopted, 2009 WL 10671956 (N.D. Ga. Oct. 2, 2009).  In another, a plaintiff lied in his complaint, discovery responses and in an unemployment hearing.  Crider v. Amerigas Propane, Inc., No. 1:16-CV-04331, 2018 WL 7019354, at *4 (N.D. Ga. Dec. 7, 2018), R. & R. adopted, 2019 WL 1178424 (N.D. Ga. Jan. 17, 2019).  The court considered this to be sanctionable bad-faith conduct.[10]  Id. at *7.  In this case, Plaintiff provided false statements in his

---

[10] In Crider, the court did not impose a dismissal sanction, instead opting for the imposition of attorney's fees. 2018 WL 7019354, at *11.  Crider is distinguishable from the case at bar, though; there, the plaintiff lied about one discrete fact—whether he smoked in his vehicle while at work—but here, Plaintiff perjured himself multiple times and about multiple different issues.  Furthermore, in that case, the court determined that lesser sanctions were appropriate because the plaintiff admitted his perjury when deposed. Id. at *9.  Plaintiff in this case has not admitted his perjury.

deposition testimony and "continued" to do so in sworn affidavits.  Defendant also presented evidence that Plaintiff provided false statements before the EEOC, e.g., denying receipt of the Policy Clarification Memo in October 2008 when he subsequently admitted receiving that memo in his disclosures to this Court.

It is true that negligence or confusion alone do not warrant a finding of willful misconduct,  Zocaras v. Castro, 465 F.3d 479, 483 (11th Cir. 2006), and the age of this case increases the likelihood of negligence or confusion in testimony about events that are now over ten years old.[11]  However, the Court does not believe that Plaintiff's testimony is the result of negligence or confusion.  During his deposition, Plaintiff was confronted with documentary evidence of various events described above—e.g., letters and memos about his job performance, records of doctor's appointments, documents from his March 2010 application for leave and so on—yet Plaintiff still chose to provide false testimony, both during the deposition and in affidavits subsequently submitted to this Court.  Those

---

[11] During his deposition, Dr. Gandy testified that "[i]t's not uncommon" for individuals with Plaintiff's medical history, namely bypass surgery, "to have minor cognitive difficulties" following the procedure or even experience "residual permanent cognitive difficulties."  [Doc. 70-1, p. 12].  However, Dr. Gandy, who specializes in cardiovascular disease and internal medicine, clarified that he is "not a neurologist," and he did not opine as to whether Plaintiff personally suffered from any of these side effects.  Id. During his deposition, he was asked if there was "any reason, medication or otherwise, why [he] would be impaired to remember things or answer questions truthfully," and Plaintiff answered that there was not.  [Doc. 54, p. 7].

deliberate actions do not suggest confusion about the facts at issue or negligence as to their veracity; rather, Plaintiff's conduct suggests a willful effort to distort the facts of his case.

While the Court concludes that Plaintiff made numerous false statements during his deposition, the Court also recognizes that "[s]tanding alone, a false or inconsistent statement in a deposition does not compel the conclusion of bad faith."[12] Byrne v. Nezhat, 261 F.3d 1075, 1125 (11th Cir. 2001), abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639 (2008). However, Plaintiff's false statements do not "stand alone." In addition to those instances of perjury, Plaintiff tampered with evidence by altering the 2010 letter to appear as if it were from 2009. Plaintiff's explanations for the alterations are

---

[12] On a similar note, Plaintiff quotes an out-of-circuit case in his Response to support the argument that perjury does not constitute "fraud on the court." [Doc. 60, pp. 8–10]; see Arnold v. Cnty. of El Dorado, No. 2:10-cv-3119, 2012 WL 3276979, at *4 (E.D. Cal. Aug. 9, 2012). However, Plaintiff misrepresented the excerpt that he quoted from this case. In Arnold, the court described two approaches for handling perjury. The first approach recognizes that dismissal, pursuant to the court's inherent powers, is an appropriate sanction for false deposition testimony. Id. The second provides that "*in the context of setting aside or modifying judgments*," a party will typically need to show something more than perjury to demonstrate fraud on the court. Id. at *5 (emphasis added). The court concluded that the first approach applied to the case before it because the defendants were "challenging the asserted untruth in the proceeding before [the proceeding became] final." Id. Similarly, Defendant here is challenging Plaintiff's perjury before this Court has issued a final judgment; an approach that applies "in the setting aside or reopening judgments context" would thus be inapplicable in the instant case. Id.

unconvincing.  Writing "Sept 2009" on the letter and signing his initials by his

handwritten employee number do not confirm that he gave the letter to his

supervisors on a given date, especially when the letter itself is undated (because

Plaintiff has written over the date).  Plaintiff offered no explanation for why the

2009 letter was otherwise identical to the 2010 letter.  Finally, Dr. Gandy testified

that he did not prepare either letter in the first place, which suggests that Plaintiff

submitted counterfeit documents to this Court under the guise of authenticity.  For

all of these reasons, the Court concludes that Plaintiff altered the 2010 letter in an

attempt to substantiate his false deposition testimony that he was placed on light

duty when he returned to work in October 2009.

Such alteration of evidence is a clear indicator of bad faith.  Oniha v. Delta

Airlines, Inc., No. 1:19-cv-05272, 2021 WL 4930127, at *4 (N.D. Ga. Sept. 13,

2021) (noting that "the concept of bad faith clearly embraces fabricating or

destroying evidence and then lying about doing so"), appeal filed, No. 21-13532

(11th Cir. Oct. 8, 2021).  Plaintiff claimed that he presented his supervisors with

the 2009 letter, which contained instructions for him to be placed on light duty, and

that he was nevertheless forced to work without modifications.  [Doc. 60-2, pp. 5–

6].  This purported 2009 letter, then, served to substantiate Plaintiff's claim that he

was denied reasonable accommodations in violation of the ADA.  Other courts in

this district have held that using altered evidence to "bolster" a claim or "rel[ying]" on such evidence throughout a lawsuit demonstrates abuse of "the judicial process and therefore constitute[s] bad faith." Neal v. IMC Holdings, No. 1:06-CV-3138, 2008 WL 11334050, at *5 (N.D. Ga. Oct. 20, 2008), R. & R. adopted, 2009 WL 10669622 (N.D. Ga. Mar. 31, 2009).

The Court will now briefly address Plaintiff's Response to the Motion for Sanctions. Therein, Plaintiff did not deny any of the alleged instances of perjury enumerated above. Instead, Plaintiff disputed the authenticity of documents filed with Defendant's Motion and used to substantiate the perjury allegations. [Doc. 60, pp. 11–17]. Specifically, Plaintiff argued that Defendant's counsel cannot properly authenticate the documents and that the documents are not self-authenticating. Id. at 14, 17. Plaintiff reproduced the entirety of Rules 901 and 902 of the Federal Rules of Evidence in his Response, see id. at 13–14, 15–17, but offered no legal authority on the interpretation or application of these rules in a like case. Plaintiff thus did not carry his burden of persuading this Court that it cannot consider the documents included with Defendant's Motion.

Defendant, on the other hand, provided persuasive legal authority on this point in its Reply brief, citing to McKinstry v. IKON Office Solutions, Inc., No. 1:05-CV-3119, 2007 WL 9700933 (N.D. Ga. Jan. 12, 2007), R. & R. adopted,

2007 WL 9701351 (N.D. Ga. Sept. 28, 2007).  In that case, the defendant

challenged "documents on the basis that they ha[d] not been properly

authenticated, not that they [were] inauthentic or otherwise inadmissible." Id. at

*4.  The court did not exclude the documents as improperly authenticated because

it lacked a "basis to conclude that the documents [could not] be authenticated at

trial." Id.  Similarly, Plaintiff here challenges only the lack of authentication of the

documents provided by Defendant; he does not argue that the documents are

inauthentic and gives this Court no reason to conclude that the documents are not

capable of authentication.[13]  The Court thus finds that Plaintiff's false testimony

and alteration of evidence constitute conduct that is sufficiently willful and in bad

faith to warrant the imposition of sanctions.

---

[13] McKinstry was before the court on the defendant's motion for summary judgment and
motion to strike.  2007 WL 9700933, at *1.  This case is not before the Court on
summary judgment.  But, as noted, Plaintiff has not provided a standard for this Court to
use in assessing evidence on a motion for sanctions.  This Court finds persuasive, though,
the standard cited in McKinstry:  "On summary judgment, courts can consider evidence
that is not currently in an admissible form so long as it is reducible to admissible form."
Id. at *4.  Of the twelve documents to which Plaintiff objects, six are documents written
or produced by Plaintiff himself.  See [Doc. 55-2, pp. 6–7, 20–23, 24–30, 38–42, 60–61,
62–64].  Two are documents from government agencies, id. at 15–19, 34–37, and one is a
document that was filed with this Court—Plaintiff's response to Defendant's
interrogatory, id. at 49–55.  One is a fax receipt from the office of Plaintiff's counsel, id.
at 43–48, and one is the employee ID access report for Plaintiff, id. at 56–59.  The Court
considers all of these documents to be easily capable of authentication and thus
"reducible to admissible form." McKinstry, 2007 WL 9700933, at *4.  Plaintiff has
given the Court no reason to think otherwise.

2.   *Lesser Sanctions*

 "In addition to finding willful contempt, a district court must consider the possibility of alternative, lesser sanctions." Zocaros, 465 F.3d at 484.  A district court must do so "[b]ecause the sanction of dismissal with prejudice is so unsparing." Mingo v. Sugar Cane Growers Co-op. of Fla., 864 F.2d 101, 103 (11th Cir. 1989).  The inherent power to dismiss an action "is appropriately exercised particularly where a party 'commits perjury or . . . doctors evidence' that 'relates to the pivotal or linchpin issue in the case.'" Quiroz v. Superior Bldg. Maint., Inc., No. 06-21594-CIV, 2008 WL 3540599, at *5 (S.D. Fla. Aug. 12, 2008) (alteration in original) (quoting Qantum Commc'ns Corp. v. Star Broad., Inc., 473 F. Supp. 2d 1249, 1269 (S.D. Fla. 2007)).  For a number of reasons, lesser sanctions would not be appropriate here.

First, as noted above, Plaintiff "doctored" evidence by altering the 2010 letter to appear as if it were from 2009.  Dr. Gandy's testimony, furthermore, confirms that these letters were not prepared by him at all, although Plaintiff presented them as if they were.  "The federal case law is well established that dismissal is the appropriate sanction where a party manufactures evidence which purports to corroborate its substantive claims." Vargas v. Peltz, 901 F. Supp. 1572, 1581 (S.D. Fla. 1995).  Excluding the altered letter would be an insufficient

28

sanction "because Plaintiff would be allowed to continue pursuing the very claim that he intended to bolster with his fabricated evidence." Oniha, 2021 WL 4930127, at *7.  The Court acknowledges, though, that Plaintiff did not rely on this doctored letter from the beginning of the lawsuit, distinguishing this case from others in which a plaintiff's use of doctored evidence *throughout* the proceedings precluded the use of lesser sanctions.  See, e.g., Neal, 2008 WL 11334045, at *6 (noting that "mere exclusion of the [doctored] evidence would be inadequate" where the plaintiff relied on it "throughout the administrative, pleading, and discovery phases of her discrimination case").  However, even if the Court were to exclude the letter alone, this sanction is not available to remedy Plaintiff's numerous instances of perjury.  An "issue-related sanction," such as an "adverse evidentiary ruling[]" or the "preclusion of specific claims, defenses or evidence," is inappropriate where "the misconduct goes to a dispositive issue, such that an issue-related sanction 'effectively disposes of the merits anyway.'"  Young v. Off. of U.S. Senate Sergeant at Arms, 217 F.R.D. 61, 70 (D.D.C. 2003) (quoting Webb v. District of Columbia, 146 F.3d 964, 972 (D.C. Cir. 1998)).  Here, Plaintiff's false statements address almost every key fact needed to adjudicate his underlying claim, such as his work performance, history of discipline and the timing of his request for medical leave.  See Qantum Commc'ns, 473 F. Supp. 2d at 1278

(noting that misconduct related to "the pivotal or 'linchpin' issue in [the] case" weighed "heavily in favor of the severe sanction of default"). Excluding his perjured testimony would essentially leave Plaintiff without a viable cause of action, and thus the lesser sanction of evidentiary exclusion is not appropriate in this case.

Second, circumstances that would ordinarily counsel against dismissal are absent in this case. Plaintiff did not admit his perjury or otherwise acknowledge his false testimony; instead, he provided more false testimony in the form of affidavits following his deposition. Cf. Crider, 2018 WL 7019354, at *11 (concluding that the plaintiff's "conduct, though sanctionable, [did] not warrant outright dismissal of his claims" in part because he "admitted to his mendacity while under oath at his deposition"). Additionally, Plaintiff was responsible for the misconduct in this case, not his counsel. See Betty K. Agencies, 432 F.3d at 1338 ("[T]he harsh sanction of dismissal with prejudice is thought to be more appropriate in a case where a party, as distinct from counsel, is culpable."). It was Plaintiff—not his counsel—who gave false deposition testimony, doctored evidence and provided false statements in sworn affidavits.[14]

_____

[14] Defendant seems to suggest that at least one of Plaintiff's perjured statements occurred with the knowledge of his counsel, in violation of the Georgia Rules of Professional Conduct. [Doc. 61, pp. 4–5] (noting that Plaintiff made the claim about the existence of a

Third, monetary sanctions alone, such as awarding attorney's fees, would be insufficient in this case given the nature of the sanctionable conduct. "[W]here there has been fraudulent misconduct, 'monetary sanctions may be inherently inadequate to remedy the harm to the public interest in preserving the integrity of the courts and in deterring future misconduct.'" Young, 217 F.R.D. at 70 (quoting Derzack v. Cnty. of Alleghany, 173 F.R.D. 400, 417 (W.D. Pa. 1996)). The Court is unconvinced that a lesser sanction, such as a monetary penalty, would serve the necessary function of deterring similar misconduct and "vindicating judicial authority." Purchasing Power, 851 F.3d at 1225; see also Oniha, 2021 WL 4930127, at *8 ("Simply acting as if [p]laintiff had not fabricated a key piece of evidence and then perjured himself at deposition would not adequately address his abuses of the judicial process. Only dismissal would do so."). For all of these reasons, the Court concludes that a lesser sanction would not suffice and thus that dismissal is the appropriate sanction in this case.[15]

---

2009 light duty letter "after a break in the deposition where he likely conferred with his counsel"). However, in the absence of more express accusations of misconduct by Plaintiff's counsel, the Court considers Plaintiff to be primarily responsible for the misconduct at hand.

[15] Defendant seeks attorney's fees in addition to dismissal of the action. Because the Court has imposed the stringent sanction of dismissal, the Court declines to award attorney's fees as well. See Access Innovators, LLC v. Usha Martin Ltd., No. 1:09-cv-2893, 2010 WL 11508119, at *4 (N.D. Ga. Apr. 28, 2010) (finding that dismissal of the

3.     *Due Process*

When a court invokes its inherent powers to sanction a party, it "must afford the sanctioned party due process." In Re Mroz, 65 F.3d at 1575.  "Due process requires that the attorney (or party) be given fair notice that his conduct may warrant sanctions and the reason why." Id.  Such notice may "come from the party seeking sanctions, from the court, or from both," and the accused party "must be given an opportunity to respond, orally or in writing, to the invocation of such sanctions and to justify his actions." Id. at 1575–76.

The Court finds that Plaintiff was afforded sufficient due process prior to the dismissal of this action.  Defendant's Motion provided Plaintiff with notice that his conduct may merit sanctions, and Plaintiff filed a Response to that Motion.  Simply filing a Response afforded Plaintiff a sufficient opportunity to address the allegations in Defendant's Motion. Cf. Neal, 2008 WL 11334050, at *2 (holding an evidentiary hearing to afford the plaintiff due process because the plaintiff had *not* filed a response to the defendant's motion for sanctions).  However, the Court also provided Plaintiff with an opportunity to depose Dr. Gandy, who Plaintiff alleged would provide exculpatory testimony (which, of course, Dr. Gandy was

---

action with prejudice was a sufficient sanction and thus declining to award attorney's fees).  Therefore, the Court **DENIES** the requested award of attorney's fees.

unable to do).  Therefore, Plaintiff was able to respond to Defendant's allegations through his Response and through the option of filing supplemental briefing following the deposition of an allegedly exculpatory witness.  These measures constitute sufficient due process.  Because Plaintiff exhibited willful and bad faith conduct, lesser sanctions will not suffice and Plaintiff was afforded due process, the Court concludes that Plaintiff's case is subject to dismissal.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion for Dismissal Sanctions [Doc. 55].  Defendant's request for attorney's fees is **DENIED**.  Defendant's request to dismiss the case is **GRANTED**.  This action is **HEREBY DISMISSED WITH PREJUDICE**.  All pending motions are **DENIED AS MOOT**.  The Clerk is **DIRECTED** to close the case.

**SO ORDERED** this 8th day of February, 2022.

**J. P. BOULEE**
United States District Judge